**FILED**
July 28, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| YMC ROYALTY COMPANY LP, | § | NO. 1:24-CV-00266-DAE |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | |
| | § | |
| WPX ENERGY PERMIAN, LLC, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

ORDER

Before the Court are three summary judgment motions,[1] as well as three objections to and motions to strike certain summary judgment evidence: (1) Defendant/Counter-Plaintiff WPX Energy Permian, LLC's ("WPX" or "Defendant") Motion for Partial Summary Judgment (Dkt. # 58); (2) Defendant's Motion for Summary Judgment of No Breach Lease (Dkt. # 59); Plaintiff/Counter-

[1] Although a fourth summary judgment motion was filed, Plaintiff YMC Royalty Company LP's Motion for Summary Judgment on WPX Energy Permian, LLC's Counterclaim and Affirmative Defenses (Dkt. # 63), the Court denied this motion without prejudice to refiling on November 17, 2025 in light of the filing of Defendant's First Amended Counterclaim. Plaintiff did not refile this motion. The instant Order, then, does not address nor rule on Plaintiff's requested relief as it pertains to Defendant's counterclaim or affirmative defenses. (Id.) However, the Court has considered the arguments contained in the motion and Defendant's response to the extent those briefings were incorporated into the parties' briefings on the motions that are in fact pending before the Court. (See Dkts. ## 88 (incorporating Dkt. # 63); 85 (incorporating Dkt. # 75).)

Defendant YMC Royalty Company LP's ("YMC" or "Plaintiff") Motion for Summary Judgment on its Breach of Contract and Quiet Title Causes of Action (Dkt. # 62); (4) Defendant's Omnibus Objections to, and Motion to Strike, YMC Royalty Company's Summary Judgment Evidence (Dkt. # 78); Defendant's Omnibus Objections to, and Motion to Strike, YMC Royalty Company's Evidence Supporting YMC's Responses to WPX's Motions for Summary Judgment (Dkt. # 87); and (6) Plaintiff's Omnibus Objections to, and Motion to Strike, WPX Energy Permian, LLC's Summary Judgment Evidence (Dkt. # 91).

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda in support of and in opposition to the motion and the relevant law, the Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Summary Judgment (Dkt. # 58), **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment of No Breach Lease (Dkt. # 59), **DENIES** Plaintiff's Motion for Summary Judgment on its Breach of Contract and Quiet Title Causes of Action (Dkt. # 62); and **DENIES** the omnibus objections to and motions to strike the various summary judgment evidence (Dkts. ## 78; 87; 91).

## FACTUAL BACKGROUND

This case arises from an oil, gas, and mineral lease (the "Lease") in Loving County, Texas. YMC, the Lessor under the Lease, brings claims for breach

of contract and lease termination against WPX, the Lessee, alleging that WPX failed to pay royalties to YMC as required by the Lease and Texas law. (Dkt. # 34.) Due to this failure, YMC asserts, the Lease terminated. (Id.) For its part, WPX does not dispute that it "underpaid" certain royalties owed to YMC but contends that (1) "underpayment" did not entitle YMC to terminate the lease, (2) the notice YMC provided was deficient, and (3) in any event, YMC has been paid more in royalty than it was owed, thereby precluding a finding that WPX breached the Lease. (See Dkts. ## 83; 58; 59.) The relevant facts are set forth below.

## I. The Lease

On October 14, 2016, Plaintiff YMC entered into an Oil, Gas, and Mineral Lease with RKI Exploration & Production, LLC ("RKI"), covering all of YMC's interests in Section 9, Block 56-T1S, T&P RR CO Survey, Loving County, Texas ("Section 9"), a 640-acre mineral estate in Loving County, Texas. (Dkt. # 74-7 at Ex. B-1 (Lease).) In November 2019, RKI assigned the lease to Defendant WPX. (Id. at Ex. 2 (Amendment to Lease).)[2]

The Lease entitles YMC to receive royalties from production. (Dkt.

[2] In its Motions, Defendant WPX states that RKI changed its name to WPX Energy Permian, LLC in April 2018. (See Dkts. ## 58 at 4 n.3 (citing to the declaration of Ciara Davis, the "Lead Accountant" of the entity Devon Energy Production, L.P., an affiliate of WPX which later acquired WPX); 59 at 4 n.3 (same).) It also describes RKI as "a wholly owned subsidiary of WPX." (Dkt. # 59 at 1.) Regardless, the parties do not dispute that, at least as of November 15, 2019, WPX was the Lessee under the Lease.

# 74-7 at Ex. B-1.) Specifically, the Lease provides:

> Royalties on leased substances to be paid by Lessee to Lessor are: (a) on oil, twenty-five percent (25%) of that produced from said land, to be delivered at the wells or, at Lessor's option, to the credit of Lessor into the pipeline to which the wells may be connected; (b) on gas, including casinghead gas, produced from said land, twenty-five percent (25%) of the amount realized from the sale thereof and any products produced therefrom to the first purchaser that is not affiliated with or related to Lessee; (c) on gas, including casinghead gas, produced from said land and used off the premises, twenty-five percent (25%) of the market value of the gas at the location where the gas would first be marketable if sold. Royalties to Lessor shall be computed and paid without deduction for any costs or expenses of development, production, treatment, separation, dehydration, gathering, compression, transportation, manufacturing, processing, fractionation, treating, marketing, or any other costs of whatsoever nature except Lessor's share of taxes on production. If royalty is not paid by the date due, Lessor may give Lessee written notice of nonpayment of royalty, by certified mail, return receipt requested, or by express mail and if Lessor's royalty is not paid on or before expiration of thirty (30) days from Lessee's date of such notice, Lessor may terminate this Lease and evict Lessee forthwith.

(Id. at Section 3 (the "Royalty Clause").)

The Lease further affords the Lessor the right to audit the Lessee's books and records, stating:

> Lessor shall have the right to audit and review all information not subject to confidentiality restrictions (including without limitation, all books, records, contracts, correspondence, run tickets, evidence of sales and shipments, reports, and electronically stored information and date) possessed by or available to Lessee which may be pertinent to the determination of the payment of royalty or other amounts due under this Lease, at the office at which such information is maintained. Such information shall include that submitted to third parties (including government entities) respecting production from said land or lands pooled therewith and relating to any royalty or any tax based upon the value of production. In conjunction with any audit Lessee shall, to the fullest extent practicable, assemble and present the information so that it is complete. THE PROVISIONS OF THIS

> PARAGRAPH SHALL SURVIVE ANY TERMINATION OF THIS LEASE.

(Id. (the "Audit Clause").)

Finally, if the Lease is terminated, the Lease provides:

> Within thirty (30) days after this Lease terminates as to any or all of said land, and upon written notice by Lessor, Lessee shall be obligated to deliver a recordable instrument of surrender as to the terminated acreage. Lessee agrees to pay Lessor the sum of Fifty Dollars ($50.00) per acre per day for each day that an instrument of surrender is not delivered as required herein.

(Id. at Section 2 (the "Surrender Clause").)

## II. The Royalty Payments and YMC's Notice of Nonpayment

In 2021, WPX was acquired by an affiliated entity, Devon Energy Corporation ("Devon"). (Dkt. # 60-2 at Ex. B, ¶ 11.) WPX asserts that, following the merger and due to an error related to the manual "mapping" of WPX's royalty payment into a new accounting software application, YMC's royalties were subject to "a small gathering fee" for a period of three months (July, August, and September of 2021).[3] (Dkts. ## 58 at 5–6; 60-1 at Ex. C, 40:11-48:2 (Peach

[3] Based on the evidence provided by the parties, it is unclear to the Court exactly how long this fee was deducted from YMC's royalties. WPX suggests that this fee was deducted for a period of three months ending in September 2021 (Dkts. ## 58 at 6; 60-3 at 3–4, ¶ 10), but the emails YMC sent to WPX suggest that the deduction also took place in October 2021 (Dkt. # 74-3 at 6), and the formal notice sent by YMC in December 2021 suggests that the deductions had not yet stopped at that point either (Dkt. # 74-7 at Ex. 3). As far as the Court is aware, the parties do not provide the Court with the monthly revenue statements that would show the deduction. See Perez v. Johnson, 122 F.3d 1067, 1067 (5th Cir. 1997) (noting that

Deposition); 60-3 at 3–4, ¶¶ 5–10 (Peach Declaration).) The total amount of the deduction over the three-month period appears to be approximately $93,194.83. (See Dkt. # 60-3 at 3, ¶ 18.)[4] When YMC received its first check following the incorporation of WPX's royalty accounting into the new software, this fee was purportedly shown on the monthly statements sent to YMC as "Other" or "Fee Category G-AffSLGth-GP-GT." (Dkt. # 60-3 at 3–4, ¶ 10.) Noticing this deduction, YMC sent an email to WPX asking for a refund of any deductions to YMC's share of revenues. (Dkt. # 74-3 at 6.)

According to YMC, in the days and weeks following, YMC made several requests that WPX correct the manner in which it was calculating and paying royalties, but those requests were ignored. (Dkt. # 73 at 3; see also Dkt. # 74-3 at 2–6.) And so, on December 3, 2021, YMC sent a formal, written letter to WPX demanding that WPX immediately refund all deductions made against YMC's royalty from inception of the Lease and stop making any such deductions moving forward. (Dkt. # 74-7 at Ex. B-3.) Citing the Royalty Clause of the Lease, the letter further stated: "[P]lease consider this Letter notice of non-payment of royalty under the Lease. The Lease will terminate in 30 days from this notice date

---

courts are not required to "scour the record" and that it is the litigant's obligation to direct the Court's attention to the relevant evidence).

[4] The parties have not pointed to any evidence demonstrating the exact amount of these deductions.

unless WPX complies with its express obligations under the Lease." (Id.)

According to WPX, when it received YMC's October 27, 2021 email, WPX "responded to the inquiry and investigated the claim." (Dkts. ## 58 at 6; see 60-1 at Ex. C, 40:11-48:2.) YMC further alleges that, after receiving YMC's December 3, 2021 letter, which WPX characterizes as only identifying one category of improper deductions (Dkt. # 58 at 6–7), it refunded in full on December 21, 2021[5] all funds withheld from payments to YMC under the identified deduction category. (Dkts. ## 60-2 at Ex. B, ¶ 18; 60-1 at Ex. A, 149:10-22 (Chaudhary Deposition); id. at Ex. C, 74:6-75:4; id. at Ex. F, 13:24-14:7, 14:17-15:10 (Rehman Deposition II); see id. at Ex. 28 to the Rehman Depo.)

Nonetheless, on December 22, 2021, YMC sent an additional letter to WPX. (Dkt. # 74-7 at Ex. B-4.) The letter stated that, although YMC had reached out to WPX "several times about WPX's breach of the Lease . . . WPX refused to take any actions to remedy its breach until [WPX's] recent emails which provide only limited explanations without any backup data or information." (Id.) The letter continued on to demand the timely delivery of specified backup data or

[5] The evidence provided by WPX, which consists of statements made by representatives of YMC or WPX, does not clearly identify the date of the alleged refund. (Compare Dkt. # 60-2 at Ex. B, ¶ 18 (stating that all funds were refunded on December 15, 2021) with Dkt. # 60-1 at Ex. C, 74:6-75:4 (explaining that the "reversal" of the improper deduction took place on December 7, 2021) and Dkt. # 58 at 7 (asserting that the refund took place on December 7, 2021).)

information related to all deductions made against YMC's royalty and noted that failure to pay YMC "all royalty owed" within the 30-day period provided for in YMC's December 3, 2021 letter would result in termination of the Lease. (Id.)[6]

After asking for and receiving a two-week extension on the deadline, WPX responded to YMC on January 10, 2022 and asked that YMC "identify the deductions that YMC is receiving for the section 9 wells outside of those refunded in December 2021 that were taken inadvertently by WPX/Devon between Sept 2021 and Nov 2021." (Dkt. # 74-7 at Ex. B-5.)[7] WPX further stated that it would make its records and data available to YMC should YMC wish to come to Oklahoma City to review them. (Id.) YMC responded on January 30, 2022, writing that YMC believed other deductions may have been taken against its royalty even before the merger with Devon, and that despite YMC's continued requests, "no one from WPX or Devon has explained what deductions have been made against YMC's royalty since WPX's acquisition of the lease in 2016." (Id. at

[6] Notably, YMC does not appear to dispute that WPX refunded the deduction identified in the monthly revenue statements, the "Other" or "Fee Category G-AffSLGth-GP-GT" deduction (see Dkts. ## 60-1 at Ex. A, 149:10-22; id. at Ex. F, 13:24-14:7, 14:17-15:10; id. at Ex. 28 to the Rehman Depo.), but instead appears to dispute whether WPX refunded *all* improper charges and deductions made against YMC's royalty (see Dkt. # 73 at 4), and further complains of WPX's failure to provide the documentation requested by YMC (see Dkts. ## 74-7 at Ex. B-4; 1 at 4).

[7] WPX admits that, during this period, it did not conduct any investigation into whether any improper deductions were being taken against YMC's royalties, outside of the one identified category. (See Dkt. # 74-2 at Ex. 5, 86:5-87:19.)

Ex. B-6.) YMC went on to argue that, in making its January 10, 2022 request, WPX was "trying to shift the burden in a manner that is clearly not allowed under the Lease[.]" (Id.) YMC again requested that WPX send YMC "a complete listing of any and all monthly deductions with supporting backup documents covering all deductions made against YMC's royalty since inception of the Lease month by month to the current date, together with a detailed explanation as to what each deduction covered." (Id.) YMC then stated: "In the event WPX did not timely comply in the manner required under the December Letters due date, the Lease has terminated per Section 3 of the Lease and based on YMC's earlier correspondence." (Id.)

## III. The Audit

On April 27, 2022, YMC formally elected to audit WPX's books and records under the terms of the Lease. (Dkt. # 74-7 at Ex. B-7.) YMC alleges that, over the next year or so, YMC and a third-party auditor (Randall Lemer) worked with WPX to obtain the documents and information necessary to evaluate the manner in which WPX was calculating and paying royalties. (Dkt. # 73 at 5.) Following the completion of the audit, YMC asserts that it believed additional information was necessary to complete its analysis, and so, on July 19, 2023, YMC filed a Verified Rule 202 Petition for Pre-Suit Deposition to obtain the allegedly missing information. (Id. at 6.) According to YMC, several hours before the

scheduled hearing on YMC's Rule 202 Petition, WPX produced a copy of a specific third-party agreement, the Gas Gathering and Processing Agreement with Stateline Processing, LLC ("Stateline"), which, in YMC's view, "confirmed that WPX was improperly calculating and paying royalties." (Id.) Based on its review of this agreement, YMC non-suited its Rule 202 Petition and filed its Original Complaint in this matter. (Dkt. # 1.)

## PROCEDURAL HISTORY

On March 8, 2024, YMC filed suit against WPX, bringing claims related to WPX's alleged failure to pay royalties to YMC, that, according to YMC, resulted in the termination of the Lease. (Dkt. # 1.) With leave of the Court, YMC amended its complaint on February 28, 2025. (Dkt. # 34.)[8] YMC's Second Amended Complaint ("SAC"), the live complaint in this case, brings six causes of action against WPX: (1) a breach of contract claim related to the alleged failure to pay royalties owed and failure to provide YMC with a recordable instrument of surrender of the Lease; (2) conversion for the failure to remit to YMC the amounts allegedly owed to YMC as a mineral co-tenant following the "termination" of the Lease; (3) a claim for violation of Section 91.404 of the Texas Natural Resources Code; (4) a money had and received claim; (5) a quite title claim; and (6) a request for an accounting/audit from WPX. (Dkt. # 34 at 7–10.)

[8] YMC previously amended its complaint in April 2024. (Dkt. # 6.)

On February 28, 2025, WPX filed its original counterclaim against YMC, contending that YMC is liable to WPX for its failure to return the "overpaid royalty amount" and that the Lease did not terminate. (Dkt. # 32.) On November 14, 2025, WPX amended its counterclaim. (Dkt. # 83.) The Amended Counterclaim brings claims for declaratory relief and to quiet title. (Id.)

In October 2025, the parties filed cross-motions for summary judgment. WPX moved for partial summary judgment on YMC's claim that the Lease terminated due to nonpayment of royalties (the Lease termination issue). (Dkt. # 58.) WPX also moved for summary judgment on all claims asserted in the SAC based on its contention that it overpaid, rather than underpaid, royalties owed to YMC. (Dkt. # 59.) Finally, YMC moved for summary judgment on its breach of contract and quiet title causes of action. (Dkt. # 62.)[9]

## LEGAL STANDARD

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving

[9] As previously noted, YMC's additional motion for summary judgment on WPX's counterclaim is not before the Court. (Dkt. # 63.)

party.'" Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'" Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536). While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if it "might affect the outcome of the suit." Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019) (citing Anderson, 477 U.S. at 248).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335 (5th

Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. Infante v. Law Office of Joseph Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v. Hillstone Rest. Grp., Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019).

Additionally, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)).

Finally, when, as here, "parties file cross-motions for summary judgment, [the court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." Green v. Life Ins. Co. of N. Am., 754 F.3d 324, 329 (5th Cir. 2014) (internal quotation marks omitted) (quoting Duval v. N. Assur. Co. of Am., 722 F.3d 300, 303 (5th Cir. 2013) ).

## APPLICABLE LAW[10]

An oil and gas lease is a contract between a lessor and a lessee. Shirlaine W. Props. Ltd. v. Jamestown Res., L.L.C., No. 02-18-00424-CV, 2021 WL 5367849, at *3 (Tex. App. — Fort Worth Nov. 18, 2021, pet. denied) (citing Tittizer v. Union Gas Corp., 171 S.W.3d 857, 860 (Tex. 2005)). "Under a typical oil and gas lease, the lessor, as the owner of mineral rights in a tract of property, gives the lessee the right to explore for and produce oil, gas, or other minerals from the property; and in turn, the lessee agrees to pay royalties to the lessor on any oil, gas, or other minerals that the lessee successfully produces from the property." Byron C. Keeling, Fundamentals of Oil and Gas Royalty Calculation, 54 ST. MARY'S L.J. 705, 706–07 (2023).

In Texas, a landowner's royalty is typically "free of the expenses

[10] Texas law governs the interpretation of the Lease in this case. Warren v. Chesapeake Expl., L.L.C., 759 F.3d 413, 415 (5th Cir. 2014).

incurred to bring minerals to the surface . . . but not expenses incurred thereafter to make production marketable[.]" Devon Energy Prod. Co., L.P. v. Sheppard, 668 S.W.3d 332, 336 (Tex. 2023). The former, the costs of bringing the minerals to the surface, are known as "production costs," whereas the latter, the costs of readying the minerals for sale, are known as "post-production costs." Id. As with any contract, this general rule can be modified by the parties, but to do so, "a royalty agreement must plainly and in a formal way express the parties' intent to operate differently." Fasken Oil & Ranch, Ltd. v. Puig, 733 S.W.3d 25, 30 (Tex. 2026) (internal quotations and citation omitted, cleaned up).

In an oil and gas lease, the royalty clause is the provision that specifies how the lessee must calculate the lessor's royalties. Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 707. These clauses, and their interpretation, are a frequent source of litigation. See id.; BlueStone Nat. Res. II, LLC v. Randle, 620 S.W.3d 380, 387 (Tex. 2021). Royalty clauses generally have three basic components: (1) a royalty fraction, (2) a yardstick, and (3) a valuation point. Randle, 620 S.W.3d at 387. As explained by a Texas state court of appeals, "[t]he royalty fraction denotes the mathematical share owed to the lessor, e.g., 1/5th, 20%[,]. . . [t]he yardstick represents the pricing mechanism for the royalty, e.g., market value, proceeds, amount realized, price . . . [a]nd the valuation point is the location at which the yardstick is applied, e.g., at the well, at

the point of sale." Devon Energy Prod. Co., L.P. v. Oliver, No. 13-25-00131-CV, 2026 WL 545190, at *3 (Tex. App. — Corpus Christi-Edinburg Feb. 26, 2026, no pet.) (citing Randle, 620 S.W.3d at 387) (internal citations omitted). "The . . . yardstick and [valuation point] are often intertwined, and in the absence of an agreement to the contrary, these parameters often dictate whether the royalty is burdened by postproduction costs, i.e., the costs incurred to prepare the minerals for downstream sale." City of Crowley v. TotalEnergies E&P USA, Inc., No. 02-24-00088-CV, 2025 WL 2005511, at *2 (Tex. App. — Forth Worth July 17, 2025, pet. denied). In royalty clauses, "[t]he valuation point is [particularly] important because the price of oil increases as it moves from the wellhead toward downstream markets where oil is regularly sold." Oliver, 2026 WL 545190, at *3.

When interpreting an oil and gas lease, standard rules of contract construction apply. Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC, 573 S.W.3d 198, 203 (Tex. 2019). However, oil and gas lease law in Texas, "has developed unique legal interpretations of royalty clauses[.]" Jamestown, 2021 WL 5367849, at *4; see Robert Theriot, Our Texas Heritage: The Summer of the No Deductions Clause, HOUS. LAW., November/December 2014, at 27–29 (describing the evolution of oil and gas lease law in Texas); Laura H. Burney, The "Post-Production Costs" Issue in Texas and Louisiana: Implications for the Fate of Implied Covenants and Pro-Lessor Clauses in the Shale Era Oil and Gas Lease, 48

ST. MARY'S L.J. 599, 617–28 (2017) (same). These unique legal interpretations "may make words and phrases about royalties mean something different than they would appear, or maybe mean nothing at all." Jamestown, 2021 WL 5367849, at *4; see, e.g., Chesapeake Expl., L.L.C. v. Hyder, 483 S.W.3d 870, 873 (Tex. 2016) (explaining that a clause expressly stating that the gas royalty is "free and clear of all production and post-production costs and expenses" and listing those costs and expenses "has no effect on the meaning of the [royalty] provision" and can instead be regarded as "emphasizing the cost-free nature of the gas royalty, or as surplusage"). The ultimate answer depends on the "particular [royalty] clause at issue construed within the context of the lease as a whole." Sheppard, 668 S.W.3d at 348.

"In construing a written contract, the primary concern of the [C]ourt is to ascertain the true intent of the parties as expressed in the instrument." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983); see Sheppard, 668 S.W.3d at 343. "In doing so, [the Court] construe[s] the instruments as a whole, giving the language its plain, ordinary, and generally accepted meaning unless the context indicates the parties used terms in a technical or different sense." Sheppard, 668 S.W.3d at 343. "To the extent possible, [the Court] strive[s] to harmonize and give effect to all the lease provisions so that none will be rendered meaningless." Id.

"If a written contract is so worded that it can be given a definite or

certain legal meaning, then it is not ambiguous." Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). But if the language of a contract is susceptible to two or more reasonable interpretations, ambiguity precludes awarding summary judgment. Coker, 650 S.W.2d at 393–94; see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996) (noting a finding of ambiguity "creates a fact issue on the parties' intent"); Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC, 639 S.W.3d 682, 690 (Tex. 2022) (same). "[W]hether the contract is ambiguous is itself a question of law for the [C]ourt to decide." First Bank v. Brumitt, 519 S.W.3d 95, 105 (Tex. 2017).

"Unambiguous contracts must be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." Sheppard, 668 S.W.3d at 343; Nettye Engler, 639 S.W.3d at 690. Nevertheless, "[e]ven if a contract is unambiguous as a matter of law, a court 'may still consider the surrounding facts and circumstances' as an 'aid in the construction of the contract's language.'" Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc., 590 S.W.3d 471, 483 (Tex. 2019) (quoting First Bank, 519 S.W.3d at 110). "[B]ut the parties may not rely on extrinsic evidence 'to create an ambiguity or to give the contract a meaning different from that which its language imports.'" First Bank, 519 S.W.3d at 109–10 (quoting Anglo-Dutch Petroleum, Int'l v. Greenberg Peden,

P.C., 352 S.W.3d 445, 451 (Tex. 2011)). "Rather, the facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else, and they can only give contract language a meaning to which it is reasonably susceptible. In other words, such evidence may not be used to add, alter, or change the contract's agreed-to terms." Nettye Engler, 639 S.W.3d at 690 (internal quotations and citation omitted). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation . . . and admit extraneous evidence to determine the true meaning of the instrument." National Union, 907 S.W.2d at 520 (citations omitted).

## DISCUSSION

The Court will address each summary judgment motion before turning to the parties' objections to the summary judgment evidence.

### I. WPX's Motion for Partial Summary Judgment (Dkt. # 58)

WPX contends that it is entitled to summary judgment on Counts 1, 2, and 5 of the YMC's Second Amended Complaint (YMC's breach of contract, conversion, and quiet title claims) "to the extent said Counts assert that the [Lease] terminated." (Dkt. # 58 at 1.) WPX argues it is so entitled because (1) an "underpayment" of royalty is not a "nonpayment" of royalty; (2) YMC's December 3, 2021 letter did not provide sufficient notice under the Lease and therefore did not result in Lease termination; and (3) there was no underpayment of

royalties as a matter of law because WPX overpaid royalties to YMC. (Id. at 1–2, 19.) Because WPX's third argument, overpayment, is briefed more fully in WPX's second summary judgment motion (Dkt. # 59), the Court will address it in a subsequent section. The Court analyzes WPX's first and second arguments below.

A. Underpayment vs. Nonpayment

First, WPX argues that, under the terms of the Lease, only the uncured "nonpayment of royalty" could be a ground for forfeiture, not a mere "underpayment" or "miscalculation" of royalties. (Dkt. # 58 at 12–15.) In other words, an "underpayment" of royalties—which is all that YMC alleges in this case—does not authorize YMC to terminate the Lease. (Id.) As such, WPX is entitled to summary judgment on YMC's claims that the Lease terminated. (Id.) YMC disputes this construction of the Lease and insists that, based on the unambiguous language of the parties' contract, an underpayment of royalty is a "nonpayment of royalty" sufficient to trigger Lease termination. (Dkt. # 73 at 7–9.) YMC has the right of it.

The relevant Lease provision states:

> If ***royalty is not paid*** by the date due, Lessor may give Lessee written notice of ***nonpayment of royalty***, by certified mail, return receipt requested, or by express mail and if Lessor's ***royalty is not paid*** on or before expiration of thirty (30) days from Lessee's date of such notice, Lessor may terminate this Lease and evict Lessee forthwith.

(Dkt. # 74-7 at Ex. B-1, Section 3 (emphasis added).)

Under Texas law, "[r]oyalty is commonly defined as the landowner's share of production, free of expenses of production." Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121–22 (Tex. 1996) (Baker, J.); see Miller v. Speed, 248 S.W.2d 250, 256 (Tex. Civ. App. — Eastland April 11, 1952, no writ). "Nonpayment" is further defined as the "[f]ailure to deliver money or other valuables, esp. when due, in discharge of an obligation," Nonpayment, Black's Law Dictionary (12th ed. 2024), or the "failure to pay," Nonpayment, Meriam-Webster, https://www.merriam-webster.com/dictionary/nonpayment (last visited July 24, 2026).

When these definitions are substituted into the Lease, it reads: "If [YMC's share of production, free of expenses of production] is not paid by the date due, Lessor may give Lessee written notice of [failure to pay] [YMC's share of production, free of expenses of production] … [.]" Read in this way, an underpayment of royalty necessarily constitutes a nonpayment of royalty because YMC does not receive its share of production when its royalty is underpaid. This construction aligns with the common definitions of nonpayment, and with its usage in the oil and gas lease context. See, e.g., Nonpayment, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/nonpayment (last visited July 24, 2026) (defining "nonpayment" as the "failure to pay a sum of money that you owe"); Linton E. Barbee, The Lessor's Remedies for Nonpayment of Royalty,

45 TEX. L. REV. 132, 132–33 (1966) (discussing remedies for the "nonpayment" of royalty as those "available to the lessor when he fails to receive *any or a part of* the production royalties which are due to him" (emphasis added)). Accordingly, the Court holds that, under the plain and unambiguous terms of the Lease, an "underpayment" of royalty qualifies as "nonpayment."[11] To the extent WPX seeks summary judgment on YMC's lease-termination claims on this basis, the Court **DENIES** that request.

B. Notice

Second, WPX asserts that, even if underpayment of royalties qualifies

[11] In its motion, WPX argues that the rule of construction against the right of forfeiture requires an interpretation that underpayments can never amount to nonpayment. (Dkt. # 58 at 14–15.) While WPX is correct that the rule of construction against the right of forfeiture applies to provisions like the one at issue in this case, Vinson Mins., Ltd. v. XTO Energy, Inc., 335 S.W.3d 344, 354 (Tex. App. — Fort Worth Dec. 16, 2010, pet. denied), the rule's application does not alter the Court's conclusion. Under the rule of construction against the right of forfeiture, "if the lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture." Id. at 354. However, here, because WPX's construction defies the common definitions, understandings, and usages of the terms "nonpayment" and "royalty" and further requires adding terms to the Lease to arrive at its construction, the Court finds that WPX's construction is not reasonable. See Sheppard, 668 S.W.3d at 343 ("[Courts] will not rewrite the leases to 'add to or subtract from [their] language' or to 'interpolate constraints' not found in the unambiguous language."). The Court therefore declines to adopt WPX's proposed interpretation. See also Barbee, supra, at 161 (noting that although forfeiture clauses are viewed with disfavor, a forfeiture clause can be enforceable if it is expressed in clear and unambiguous language). Further, WPX's suggested interpretation could lead to an absurd result, i.e. a lessee pays a dollar towards a multi-thousand-dollar lease and then avoids termination merely because it underpaid.

as "nonpayment," YMC did not provide the required notice under the express terms of the Lease. (Dkt. # 58 at 15–19.) In WPX's view, YMC's December 3, 2021 provided notice and the opportunity to cure only one category of improper deductions: the "Other" or "Fee Category G-AffSLGth-GP-GT" deduction. (Id.) Because that deduction was full and timely refunded, it cannot serve as grounds for termination. (See id.) And, although YMC claims to have identified other "nonpayments" during the audit, it did not provide notice of any of these additional nonpayments or an opportunity to cure them prior to any alleged Lease termination. (Id.) Thus, the Lease did not terminate pursuant to the December 3, 2021 notice. (Id.)

Because forfeiture clauses are disfavored, "if the lease contains a provision giving the lessee a right of notice of any breach or default before declaring any forfeiture, it must be 'literally complied with.'" Vinson Mins., Ltd. v. XTO Energy, Inc., 335 S.W.3d 344, 354 (Tex. App. — Fort Worth Dec. 16, 2010, pet. denied). "Under such a provision, the lessor cannot claim a forfeiture without giving the lessee the benefit of notice of any default and an opportunity to remedy it." Id.

The relevant language of the Lease provides:

> If royalty is not paid by the date due, ***Lessor may give Lessee written notice of nonpayment of royalty, by certified mail, return receipt requested, or by express mail*** and if Lessor's royalty is not paid on or before expiration of thirty (30) days from Lessee's date of such notice, Lessor may terminate this

Lease and evict Lessee forthwith.

(Dkt. # 74-7 at Ex. B-1, Section 3 (emphasis added).)

YMC claims that the Lease terminated on the basis of WPX's alleged failure to pay royalties on plant fuel, failure to pay royalties on flared gas, and improper deductions to royalties on NGLs. (Dkt. # 62 at 18; see Dkt. # 73 at 9–16.) In YMC's view, its December 3, 2021 written demand "literally complied" with the requirements under the Lease and applied to "any attempt by WPX to 'deduct, assess, reduce, or charge YMC's royalty for any expense or costs.'" (Dkt. # 73 at 11.) Therefore, when WPX failed to cure (i.e., ensure that YMC's royalties were being paid and calculated properly within 30 days of the December 3, 2021 notice), the Lease terminated. (See id. at 9–16.) The Court disagrees.

As previously noted, Texas law disfavors forfeiture clauses. See Barbee, supra, at 161; see, e.g., Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987). Indeed, "[c]ourts will not declare a forfeiture unless they are compelled to do so by language which can be construed in no other way." Id. at 530. Moreover, whenever possible, "[c]ourts will avoid … a construction which is unreasonable, inequitable, and oppressive." Id. And, courts must "construe the instruments as a whole, giving the language its plain, ordinary, and generally accepted meaning unless the context indicates the parties used terms in a technical or different sense." Sheppard, 668 S.W.3d at 343.

With these principles in mind and viewing the provision in light of the Lease as a whole, the Court construes the Lease's notice provision as requiring notice of the specific way or ways in which the lessee breached the lease. See Outdoor Sys., Inc. v. BBE, L.L.C., 105 S.W.3d 66, 68, 71 (Tex. App. — Eastland Mar. 20, 2003, pet. denied) (in a landlord/tenant lease, finding that the notice was "insufficient, as a matter of law, because [it] was not specific; … [and] was excessive, imprecise, and unreasonable."); cf. Sowell v. Nat. Gas Pipeline Co. of Am., 789 F.2d 1151, 1156 (5th Cir. 1986) (rejecting the lessee's argument that notice was not sufficient because it did not advise the lessee of the condition of the breach where the notice expressly informed the lessee of the proper calculation of royalties at issue); see also Notice, Black's Law Dictionary (12th ed. 2024) (defining "notice" as "[l]egal notification required by law or agreement …; definite legal cognizance, actual or constructive, of an existing right or title"); Montana E. Pipe Line Co. v. Shell Oil Co., 216 F. Supp. 214, 221 (D. Mont. 1963), aff'd, 342 F.2d 430 (9th Cir. 1965), cert. denied 382 U.S. 975 (1966) (describing the "general rule that notice or demand is a prerequisite to cancellation or forfeiture for breach of covenants of the lease, whether express or implied" and that such "notice should express clearly the dereliction of which complaint is made").

Interpreting the notice provision otherwise would deny WPX the opportunity to cure any deficiency and would result in a construction that is

"unreasonable, inequitable, and oppressive." See Vinson, 335 S.W.3d at 354; Reilly, 727 S.W.2d at 530; Frost Nat. Bank v. L & F Distributors, Ltd., 165 S.W.3d 310, 312 (Tex. 2005). For example, if the Court were to adopt YMC's proposed interpretation of the notice provision, YMC could send a general, nonspecific notice of nonpayment to WPX, and years later, after an underpayment was discovered—whether that underpayment is for $1,000,000 or $1—obtain a termination dating back to 30 days after the date of the original notice. Indeed, such an outcome becomes even more "unreasonable, inequitable, and oppressive" when paired with the audit provision, which entitles YMC to audit the lessee's books to determine if royalty payments are being properly calculated.[12] (See Dkt. # 74-7 at Ex. B-1, Section 3.) The Court therefore declines to interpret the Lease in this way.[13] See Sheppard, 668 S.W.3d at 343; Reilly, 727 S.W.2d at 530;

---

[12] The Court agrees with WPX that the existence of the audit provision—located in the exact same section as the Royalty Clause and notice provision—emphasizes the parties' intent that a general demand of payment of all royalties due, without more, would not satisfy the notice provision. The audit provision allows the lessor to audit and review information possessed by the lessee that may be pertinent to the determination of the payment of royalty. (Dkt. # 74-7 at Ex. 1, Section 3.) As explained by WPX, if the audit discovers deficiencies, the lessor is able to provide notice of the same, and if those deficiencies were not cured to the lessor's satisfaction, the lessor can provide notice and an opportunity to cure at that point or sue for damages. (See id.) Viewing the notice provision in harmony with the audit provision reinforces the Court's conclusion here. See Sheppard, 668 S.W.3d at 343.

[13] To argue to the contrary, YMC relies on an opinion issued in 2000 by the Corpus Christi-Edinburg Court of Appeals. (See Dkt. # 73 at 10–11 (citing Coastal Oil & Gas Corp. v. Roberts, 28 S.W.3d 759 (Tex. App. 2000), judgment set aside (Mar.

Vinson, 335 S.W.3d at 354.

The Court finds that to comply with the express terms of the Lease, YMC's notice was required to identify the specific way in which WPX breached the Lease (i.e., the specific nonpayment at issue). Because YMC's December 3, 2021 notice did not identify any uncured nonpayment of royalty (Dkts. ## 62-9; 74-7 at Ex. B-3), YMC's notice did not comply with the Lease and did not trigger Lease termination. WPX's motion on this issue is **GRANTED**. Counts 2 and 5 of Plaintiff's Second Amended Complaint, to the extent said counts assert that the Lease terminated, are **DISMISSED**.[14]

II. WPX's Motion for Summary Judgment of No Breach of Lease (Dkt. # 59)

In its second summary judgment motion, WPX argues that it is entitled to summary judgment on all of the claims asserted in the SAC because, in actuality, YMC received more money in royalties each month than it was entitled.

---

21, 2002)).) That case is distinguishable, however, both on the facts and the terms of the notice provision. See Coastal, 28 S.W.3d at 763–64 (where lease required only "written demand of payment" rather than "notice" and where lessee did not pay lessor any royalty on one of the wells, a fact known to both parties). Moreover, the judgment in that case was subsequently set aside on March 21, 2002. The Court does not find Coastal applicable or persuasive to the facts at hand.

[14] WPX also seeks dismissal of Count 1, Plaintiff's Breach of Contract claim. To the extent YMC claims WPX breached the Lease by failing to provide a recordable instrument of surrender following Lease termination, that claim is **DISMISSED**. However, because YMC's Breach of Contract claim has other bases, Count 1 remains.

(Dkt. # 59 at 1–2, 19.) Accordingly, WPX did not breach the Lease as a matter of law. (Id.)

YMC contends that WPX breached the Lease in four ways: (1) by failing to pay royalties on volumes of gas flared at various well locations ("flared gas"); (2) by failing to pay royalties on volumes of gas used as fuel in a processing plant ("plant fuel"); (3) by underpaying royalties on natural gas liquids ("NGLs") (i.e., making improper deductions from the royalties due to YMC from the sale of NGLs); and (4) by failing to provide a recordable instrument of surrender of the Lease. (See Dkts. ## 34 at 7; 62 at 7–16.) In the instant motion, WPX argues that: (1) it did not make improper deductions from YMC's royalties on NGLs; (2) royalties are not due on volumes flared at well locations and volumes used as fuel in a processing plant; and (3) even if royalties were owed on volumes flared at well locations or those used as fuel in a processing plant, WPX's failure to pay such royalties is excused by WPX's overpayment of royalties on oil. (Dkt. # 59.) The Court analyzes each argument in turn.

A. Deductions on NGLs

WPX first argues that there were no "deductions" from YMC's royalites on NGLs as a matter of law. (Dkt. # 59 at 10, 14–19.) To understand WPX's argument, it is necessary to first discuss some basics of WPX's production and sale of NGLs.

WPX describes its production and sales process with respect to NGLs as follows:[15] at the mouth of each well, a single hydrocarbon stream—a mixture of molecules containing oil, natural gas, and water—is produced. (Dkt. # 60-6 at ¶ 4 (Brady Declaration).) At each well location, the stream passes through a series of separators where the oil, natural gas, and water molecules are separated. (Id.) After it is separated, WPX moves the natural gas from the wells into a gathering system[16] owned by an affiliate of Stateline Processing LLC ("SLP").[17] (Dkt. # 60-5 at ¶ 6 (Lasley Declaration).) The gas then travels through the SLP gathering

[15] YMC largely does not dispute WPX's description of its production and sales processes. (See Dkt. # 72.) For those facts not disputed by YMC or not refuted with proper support, the Court accepts WPX's description and considers it as undisputed for purposes of the motion. See Fed. R. Civ. P. 56(e)(2), (3); Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co., No. CIV.A. 5:04CV047-C, 2005 WL 1132851, at *3 (N.D. Tex. May 10, 2005) ("If the non-moving party does not identify specific issues of disputed fact, the court may take the moving party's description of the facts as prima facie evidence supporting summary judgment summary judgment for that party. . . A party defending against a proper motion for summary judgment may not rely on mere denial of material facts or on unsworn allegations in the pleading or arguments and assertions in briefs or legal memoranda; rather, the party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.).

[16] A gathering system is a series of pipelines that connect multiple wells into a single system to efficiently aggregate the gas for transportation to a central point, such as a gas processing plant. See Nettye Engler, 639 S.W.3d at 692.

[17] SLP is purportedly owned by Catalyst Midstream Partners, LLC ("Catalyst"). (Dkt. # 60-5 at ¶ 7.) According to the testimony submitted by WPX, a WPX affiliate, WPX Midstream Holdings, LLC, and Howard Energy Partners LLC ("Howard") own Catalyst on a 50/50 basis. (Id.) Howard operates and manages SLP and oversees all gas gathering, processing, contract management and, if applicable, all sales of residue gas and y-grade NGLs. (Id.)

system to one of four gas processing plants.[18] (Id.) At each plant, the gas is processed into residue gas and y-grade NGLs ("NGLs"). (Id.)

WLX and SLP have a written contract for SLP to gather and process WPX's gas. (Dkt. # 61-3 at 26:12-27:25 (Elder Deposition); id. at Ex. 4 (Gas Gathering Agreement).) Pursuant to this contract, Howard Energy Partners LLC ("Howard"), on behalf of SLP, charges WPX a fee for gathering, compressing, and processing the gas. (Dkt. # 60-5 at ¶ 8.) At the "tailgate," or exit point, of the SLP processing plant, Howard redelivers the residue gas volumes to WPX and purchases the y-grade NGLs pursuant to the contract. (Id.)

SLP then sells the y-grade NGLs at the tailgate of the SLP plant to unaffiliated third-party purchasers—namely, ONEOK, BP Energy, and DCP (the "Third-Party Purchasers"). (Dkt. # 61-3 at 30:1-31:24, 66:23-67:25; id. at Exs. 5, 6, 13.) As testified by SLP's representative, the point of sale to each Third-Party Purchaser is the tailgate of the SLP plant in Reeves, County, Texas. (Id. at 43:9-22, 87:13-15, 98:19-100:11, 102:3-103:22, 125:4-127:24; id. at Ex. 5, Ex. 6, Ex. 14.) At the point of sale, the Third-Party Purchasers take possession of and title to the y-grade NGLs. (Id. at 43:9-22, 104:10-23, 128:1-16.)

---

[18] According to WPX, YMC's royalty underpayment claims relating to NGLs arise solely from the gas processed at one of the four plants, the plant owned by SLP. (Dkt. # 59 at 6.) The subsequent discussion thus focuses on the SLP plant specifically. (See id.)

When the Third-Party Purchasers buy the NGLs from SLP, they pay SLP according to industry-standard price formulas set out by their respective contracts. (See id. at 79:9-80:25, 81:5-84:1; Dkts. ## 60-1 at Ex. J, 62:2-70:13; 64-7 at § 4.B, 7 (Purchase Agreement between SLP and ONEOK); 64-8 at § 3.E (Purchase Agreement between SLP and DCP); 64-9 at 2 (SLP Contract with BP Energy).) The price formula in each contract is a calculation consisting of published prices for sales of fractionated natural gas purity liquids at Mont Belvieu, Texas (the "index price") adjusted by value proxies to reflect possible costs the Third-Party Purchaser might incur to transport the NGLs to Mont Belvieu and to fractionate the NGLs into purity products. (See id.)

According to WPX, "[these] value adjustments are made to reflect the differences in values for fractionated natural gas liquid purity products—like propane, butane, and pentane—in the highly liquid market at Mont Belvieu, which is north of Houston, Texas and 600 hundred miles from the SLP plant, and Reeves County, Texas." (Dkt. # 59 at 8 (citing Dkt. # 61-3 at 79:9-80:25, 81:5-84:1); see also Dkt. # 60-1 at Ex. J, 62:2-70:13).) WPX submitted testimony asserting that these adjustments are not fees that SLP itself pays but rather are costs incorporated into the pricing formula.[19] (Dkt. # 61-3 at 40:2-43:3, 43:9-23, 49:2-50:7 (DCP),

[19] As discussed further below, YMC disputes this characterization. (See Dkts. ## 62 at 14–15; 72 at 10.)

54:11-66:22 (ONEOK), 109:11-111:17, 125:4-7, 128:17-130:20, 130:22-134:14 (BP Energy); id. at Exs. 5, 6, 13; see Dkt. # 61-2 at 94:24-97:19, 111:24-114:22, 122:14-125:6 (Leathers Deposition).) In other words, the price SLP receives from the Third-Party Purchasers is the index price minus a set of specified costs. (Id.) After SLP is paid by the Third-Party Purchasers, SLP, by and through Howard, pays WPX the gross proceeds it received from the Third-Party Purchasers and charges WPX fees for gathering, electricity, processing, and marketing. (Dkt. # 61-3 at 91:14-97:17; id. at Ex. 7.)

The parties disagree as to whether WPX properly calculates and pays YMC its royalties on NGLs. It appears to be undisputed that WPX does not deduct or pass back to YMC any of the fees that SLP/Howard charged WPX for gathering, electricity, processing, and marketing (the pre-sale post-production costs) (i.e., WPX adds these charges back into the royalty base) and that doing so is proper under the Lease. (See Dkts. ## 72; 62; 59.)[20] However, in calculating YMC's royalty, WPX does not "add back" the transportation and fractionation fees

[20] In its summary judgment motion, but not its response to WPX's summary judgment motion, YMC includes two short paragraphs in which it argues that WPX improperly deducts post-production costs *prior* to the point of sale. (Dkt. # 72 at 15–16.) In support of this argument, YMC cites to a 2017 contract between RKI and SLP, which describes an "NGL Price"—the price SLP pays to WPX for the NGLs—as the price received by SLP, less a reduction for fees or charges for transportation, treating, blending, or other costs "actually incurred in making the sale." (Id. (citing Dkt. # 64-2 at Ex. D).) The Court addresses YMC's argument in the ensuing discussion.

included in the contracts with the Third-Party Purchasers to YMC's royalty base. (See Dkts. ## 60-5 at ¶ 13; 61-2 at 64:2-66:1, 122:14-125:6; see also Dkt. # 61-2 at 125:7-127:21.)[21] It is the "deduction" of these costs that lies at the heart of the parties' dispute.

In YMC's view, the costs and expenses included in the Third-Party Purchaser contracts are deductions of post-production costs, deductions that are expressly prohibited by the Lease. As YMC explains, "[b]ecause the Lease broadly and expressly requires that royalties be computed and paid without deduction for post-production costs or 'any other costs of whatsoever nature,'" WPX is not entitled to compute and pay royalties in this way and must instead add the transportation and fractionation fees back into the royalty base before calculating YMC's royalties. (Dkt. # 62 at 11–15; see Dkt. # 72 at 7–10.) WPX disagrees. It argues that under the Lease, YMC's royalty on NGLs is to be paid from the actual amount received from the sales to unaffiliated third parties, without the deduction of post-production costs *from that amount*. (Dkt. # 59 at 14–19.) Because SLP paid WPX the actual amounts it received, i.e., the gross proceeds of

[21] As explained by another court in a similar case, "[p]ut simply, [WPX] receives a lower price for the captured minerals—which means a lower royalty base from which [YMC] takes its … royalty share—because the pricing formula in the third-party contract accounts for the third party's postproduction costs." H.L. Hawkins, Jr., Inc. v. Capitan Energy, Inc., No. P:22-CV-00020-DC, 2023 WL 5158051, at *4 (W.D. Tex. Aug. 10, 2023).

the sales, and WPX in turn paid YMC royalties on the actual amount it received from SLP, there were no improper deductions. (Id.)

The Lease provision at issue states:

> Royalties on leased substances to be paid by Lessee to Lessor are: . . . (b) ***on gas***, including casinghead gas, produced from said land, ***twenty-five percent (25%) of the amount realized from the sale thereof*** and any products produced therefrom to the first purchaser that is not affiliated with or related to Lessee; . . . ***Royalties to Lessor shall be computed and paid without deduction*** for any costs or expenses of development, production, treatment, separation, dehydration, gathering, compression, transportation, manufacturing, processing, fractionation, treating, marketing, ***or any other costs of whatsoever nature*** except Lessor's share of taxes on production.

(Dkt. # 74-7 at Ex. B-1 (emphasis added).)

To determine the amount of royalty due under a monetary royalty clause, the Court must determine the (1) location or point of royalty valuation, and (2) method of valuation. See Randle, 620 S.W.3d at 387; Jamestown, 2021 WL 5367849, at *6; City of Crowley, 2025 WL 2005511, at *2; Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 713–31. In this case, (1) the location or point of royalty valuation is the point of sale by SLP to the Third-Party Purchasers, and (2) the method of valuation is the amount realized from the sale. This type of royalty clause is known as an "amount realized" clause. See Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 726–28; Randle, 620 S.W.3d at 389.

An "amount realized" clause "require[s] measurement of the royalty

based on the amount the lessee *in fact receives* under its sales contract[.]" Randle, 620 S.W.3d at 389 (quoting Bowden v. Phillips Petroleum Co., 247 S.W.3d 690, 699 (Tex. 2008)) (emphasis in original). Generally, this type of clause, "standing alone, creates a royalty interest that is free of postproduction costs." Id. at 390; see Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 726–28 (explaining that for an "amount realized" clause, the "general rule is that the lessee must calculate its royalty payments to the lessor on the basis of the actual sales price that the lessee received for its production at the point of sale, without any deductions for postproduction costs," i.e., the gross proceeds of the sale); City of Crowley, 2025 WL 2005511, at *2 ("[W]hen the sale occurs at a point downstream from the wellhead—after at least some postproduction has occurred—then the gross-proceeds royalty is free from postproduction costs, meaning that the royalty holder 'share[s] in the enhanced value of production but not the expenses incurred to make it so.'" (quoting Sheppard, 668 S.W.3d at 336–37, 348)). That is to say, an "amount realized" clause, unless otherwise modified, is sufficient to excuse a lessor from bearing post-production costs incurred *up to the point of sale*. Sheppard, 668 S.W.3d at 338–39, 346; id. at 344 ("The question is not whether an unaffiliated buyer's postproduction costs are gross proceeds under the leases or under the law. Of course, they are not."); see Burlington, 573 S.W.3d at 204 (explaining that the holder of an "amount realized" royalty where the location of

valuation is the point of sale "would generally not be responsible for post-production costs," and describing those costs as those "expended prior to the sale"); Randle, 620 S.W.3d at 390–91.

Here, the Court finds that the plain language of the parties' Lease creates a royalty interest based on the gross proceeds WPX receives from the sale of the NGLs to Third-Party Purchasers, free of post-production costs *up to* that point of sale. The summary judgment evidence demonstrates that WPX in fact calculates YMC's royalties in this way. Specifically, the evidence shows that SLP pays WPX its gross proceeds of sale (Dkts. ## 61-3 at 40:2-43:3, 43:9-23, 49:2-50:7, 54:11-66:22, 71:8-71:24, 91:14-97:17, 109:11-111:17, 125:4-7, 128:17-130:20, 130:22-134:14; id. at Exs. 5, 6, 13; 61-2 at 64:17-66:1, 94:24-97:19, 111:24-114:22, 122:14-125:6),[22] and WPX in turn pays YMC royalties based on the gross amount received from SLP, without deduction of post-production costs up to the point of sale to the Third-Party Purchasers (id.).[23] Under the language of the Lease, then, WPX properly calculated and paid YMC's royalty on NGLs. See

[22] Crucially, the transportation and fractionation fees incorporated into the pricing formulas are not fees incurred by WPX or SLP prior to the point of sale. Rather, they are adjustments for possible costs the Third-Party Purchasers might incur to transport the NGLs to Mont Belvieu and to fractionate the NGLs into purity products. (Dkt. # 61-2 at 40:2-43:3, 43:9-23, 71:8-24, 79:9-80:25, 81:5-84:1, 87:2-88:13, 94:8-95:8, 104:10-106:18, 115:13-116:20, 129:18-130:20.)

[23] Although WPX is charged fees by SLP, those pre-sale fees are added back into the royalty base. (Dkt. # 61-2 at 64:2-65:18, 122:14-125:6.)

Randle, 620 S.W.3d at 389–90; Sheppard, 668 S.W.3d at 338–39, 346.

YMC argues that, because the price SLP receives includes a cost-adjustment for transportation and fractionation fees, WPX in effect "deducts" fees from YMC's royalties, which is expressly prohibited under the Lease. (Dkts. ## 62 at 11–15; 72 at 7–10.) To make this argument, YMC points to the "no deduction" provision of the lease, which provides: "Royalties to Lessor shall be computed and paid without deduction for any costs or expenses of development, production, treatment, separation, dehydration, gathering, compression, transportation, manufacturing, processing, fractionation, treating, marketing, or any other costs of whatsoever nature except Lessor's share of taxes on production." (Dkt. # 74-7 at Ex. B-1 (emphasis added).) According to YMC, this language is not limited to prohibiting deductions for post-production costs incurred between the wellhead and the point of sale; rather, it also prohibits deductions related to unaffiliated buyer's post-production costs. (Dkts. ## 62 at 11–15; 72 at 7–10.)

YMC's position is not supported by the law nor the plain language of the Lease. "No deduction" clauses like the one in this case are not uncommon. See Oliver, 2026 WL 545190, at *4; Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 731; see, e.g., H.L. Hawkins, Jr., Inc. v. Capitan Energy, Inc., No. P:22-CV-00020-DC, 2023 WL 5158051, at *1 (W.D. Tex. Aug. 10, 2023). In Texas, in a "gross proceeds" or "amount realized" lease, "no

deduction" clauses are generally treated as surplusage that merely reinforce the parties' intent that the lessor receive its share of the downstream sales price free of post-production costs. Hyder, 483 S.W.3d at 873 (holding that the clause stating that the gas royalty was to be "'free and clear of all production and post-production costs and expenses' has no effect on the meaning of the provision . . . [and] might be regarded as emphasizing the cost-free nature of the gas royalty, or as surplusage"); Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 734 n.162 (noting that "no deduction clauses" are not incompatible with a gross proceeds royalty clause and rather "reinforce[] the parties' intent that the lessor is entitled to its royalty share of the downstream sales price that the lessee receives on selling its oil and gas production"); Randle, 620 S.W.3d at 393 n.64 ("In the context of other leases, no-deductions provisions have been construed as surplusage with respect to royalties valued at the well or as redundant of gross proceeds calculations." (citing Hyder, 483 S.W.3d at 873–74, 876; Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 130–31 (Owen, J.) (plurality op.); and Heritage, 939 S.W.2d at 122-23 (Baker, J.))); see also Heritage, 939 S.W.2d at 130–31.

"No deduction" clauses, however, do not typically free the royalty from *post-sale* costs. Oliver, 2026 WL 545190, at *4 n.6; see Sheppard, 668 S.W.3d at 344–47. Rather, they apply only to "post-production costs incurred by

the producer *up to the valuation point*." Oliver, 2026 WL 545190, at *4 (emphasis added). "For example, if the valuation point is at a point of sale downstream from the well and a clause frees the royalty of post-production costs, then the royalty payment shall be based on the yardstick at the point of sale (without any deduction related to post-production costs incurred by the producer *pre-sale*)." Id. (emphasis added).

As YMC correctly points out, parties to a mineral lease can modify this general rule. But the parties have not done so here. See Fasken, 733 S.W.3d at 30 (to deviate from the general rules, "a royalty agreement must plainly and in a formal way express the parties' intent to operate differently" (cleaned up)). Indeed, the contractual language Texas courts have found sufficient to displace the default rule has been far more explicit and expansive than the language that appears in the parties' Lease here. For example, in Sheppard, the Texas Supreme Court construed a lease that provided for a royalty based on "the gross proceeds realized from the sale of such gas, free of all costs and expenses to the first non-affiliated third party purchaser under a bona fide arms length sale or contract." 668 S.W.3d at 337. This lease, the Texas Supreme Court explained, was a "gross proceeds" lease that entitled the lessor to royalties based on "point-of-sale proceeds without deduction of postproduction costs." Id. at 343–44. The language of the royalty provisions alone sufficed to free the royalty from all pre-sale costs, the

Court said, but the lease in Sheppard went further. Specifically, the lease also provided that "[i]f any disposition, contract or sale of oil or gas shall include *any reduction or charge for the expenses or costs* of [postproduction] then such deduction, expense or cost *shall be added to … gross proceeds* so that Lessor's royalty shall *never be chargeable directly or indirectly with any costs or expenses* other than its pro rata share of severance or production taxes" (the "add-on" provision). Id. at 337–38 (emphasis in original). This provision, the Texas Supreme Court wrote, was not at all "common, usual, or standard." Id. at 346. Rather, the "add-on" provision required that "'any reduction or charge' for postproduction costs . . . included in the producer's disposition of production . . . be 'added to' gross proceeds so that the landowners' royalty 'never' bears those costs even 'indirectly.'" Id. at 345. This language "plainly and in a formal way" expressed the parties' intent for the lease to "operate differently" than the typical "gross proceeds" lease, creating what the Court described as a "proceeds plus" lease. Id. at 346, 348. Under this unique type of lease, royalties were to be calculated on gross proceeds free of post-production costs *and* any enumerated post-production costs deducted in setting the sales price were to be added back to the gross proceeds before the royalty was calculated. Id.

By contrast, the Lease in this case contains no language comparable to

that in Sheppard.[24] In the absence of such language, the Court does not understand

---

[24] The lease in Sheppard did also include a "no deductions" provision similar to the one here. See Sheppard, 668 S.W.3d at 338 ("Payments of royalty under the terms of this lease *shall never bear or be charged with, either directly or indirectly, any part of the costs or expenses* of production, gathering, dehydration, compression, transportation, manufacturing, processing, treating, post-production expenses, marketing or otherwise making the oil or gas ready for sale or use, nor any costs of construction, operation or depreciation of any plant or other facilities for processing or treating said oil or gas."). However, it was not this provision upon which the Texas Supreme Court's decision rested. See id. at 345–48; City of Crowley, 2025 WL 2005511, at *7, 7 n.10 (explaining that although Sheppard included a "no deduction" clause, the "linchpin" of the Sheppard court's ruling was the add-on language in the lease, not the "no deduction" clause, and noting that the "no deduction" clause in Sheppard "did not provide a separate basis for requiring royalties to be paid on post-sale postproduction expenses"). Similarly, in this case, because the Lease in this case lacks language that either *shifts the valuation point downstream* or that requires *adding an amount* to the royalty base, the Court does not find that the Lease requires adding any post-sale costs to WPX's gross proceeds of sale. See Sheppard, 668 S.W.3d at 345–48; id. at 347 (discussing the Texas Supreme Court's opinion in Heritage and describing the plurality opinion as explaining that, "to make a royalty free of postproduction costs, a lease could change the point at which it was valued or specify that something would be added to the royalty base"); Fasken, 733 S.W.3d at 32 ("Absent reference to another valuation point or calculation method in the deed, cost-free language merely restates the rule that a royalty interest is free of costs incurred in exploring for and producing the raw minerals."). That the parties' Lease includes language prohibiting deductions for "any other costs of whatsoever nature" does not alter this conclusion. See id.; Oliver, 2026 WL 545190, at *1, 6 (in a case dealing with similarly broad language, namely that the royalty "shall never bear, either directly or indirectly . . . *any other costs or expenses whatsoever*," determining that such language is "mere surplusage" in part because it did not specify amounts to be *added* to the royalty payment); City of Crowley, 2025 WL 2005511, at *7, 7 n.10; see also Admiral Ins. Co. v. Briggs, 264 F. Supp. 2d 460, 462–63 n.4 (N.D. Tex. 2003) ("The doctrine of *ejusdem generis* is 'a rule of contract construction that provides that, if words of a specific meaning are followed by general words, the general words are interpreted to mean only the class or category framed by the specific words.'").

the Lease to alter the default rule and require WPX to add back the downward adjustments incorporated into pricing formula in the Third-Party Purchaser sales contracts. See Sheppard, 668 S.W.3d at 344–48; see also Gringita, Ltd. v. Ineos USA Oil & Gas, L.L.C., No. SA-25-CA-00595-XR, 2026 WL 1329914, at *1, 7–8 (W.D. Tex. May 8, 2026) (as in Sheppard, interpreting a lease that contained specific "add to" language, and, because of that language, finding that the lease required the lessor to add to the royalty base the value of any sales-price deductions).

YMC insists that the language prohibiting the deduction of "any other costs of whatsoever nature" transforms the Lease into a "proceeds plus" lease. (Dkt. # 72 at 9–10.) The Court disagrees. Texas courts have repeatedly found "no deduction" clauses with similarly broad language to be nothing more than "mere surplusage." See Hyder, 483 S.W.3d at 871, 873 (where the lease provided that the royalty is expressly "free and clear of all production and post-production costs and expenses," holding that such language "has no effect on the meaning of the provision" and can be regarded as "surplusage"); Sheppard, 668 S.W.3d at 344 (in the absence of "add to" language, an unaffiliated buyer's post-production costs are not included in "gross proceeds" under the law); Hawkins, 2023 WL 5158051, at *1, 7 (where the lease provided that the royalty "shall not bear or be charged with, directly or indirectly, any cost or expense incurred by Lessee," finding that the

lease's terms did not require the lessee to add back the deductions incorporated into the pricing formulas in its third-party sales contracts); Oliver, 2026 WL 545190, at *1, 6 (in the case of an "at the well" lease, where the lease provided that the royalty "shall never bear, either directly or indirectly . . . any other costs or expenses whatsoever," determining that such language is "mere surplusage"). The "no deduction" provision here therefore operates similarly, and the Court finds unpersuasive YMC's arguments to the contrary.

The summary judgment evidence demonstrates that the "deductions" YMC complains of were not post-production costs incurred pre-sale by WPX or SLP but instead post-sale post-production costs incorporated into the pricing formula in its third-party sales contracts.[25] Under the unambiguous language of the parties' Lease and the relevant law, WPX thus did not violate the Lease when it did not add back to the royalty base these pricing formula adjustments. Accordingly, the Court will **GRANT** WPX's summary judgment motion to the extent WPX seeks a determination that the inclusion of transportation and fractionation fees in

[25] Contrary to YMC's arguments, the summary judgment evidence reveals that the pricing formula adjustments are not "deductions" despite how they might be phrased in the contracts or monthly invoices. SLP does not pay these "fees" separate and apart from the pricing formulas. These fees are instead incorporated into the price that the Third-Party Purchasers pay SLP. This practice is standard in the industry and is no different from the costs discussed in Sheppard, Hawkins, and Gringita. SLP pays WPX its gross proceeds of sale, which WPX then uses to calculate YMC's royalties. WPX is permitted to do so under the Lease.

the pricing formula with third-party purchasers constitutes an improper deduction under the Lease.[26]

B. Flared Gas and Plant Fuel

Next, in its motion, WPX states that it "maintains that royalties are not due on volumes flared at the well locations or those used as fuel in a processing plant." (Dkt. # 59 at 3.) However, as pointed out by YMC, WPX does not provide any support for this statement in its briefings. (See Dkt. # 59.) Rather, WPX seems to concede underpayment on flared gas and plant fuel for the purposes of this motion because, in WPX's view, even if the Court credits YMC's underpayment claims on these two categories of gas, the amount WPX allegedly overpaid YMC in oil royalties exceeds the amounts allegedly underpaid on these

[26] As previously noted, YMC briefly argues in its summary judgment motion that, in addition to the value adjustments included in the third-party contracts, WPX makes further improper deductions by selling gas to SLP for a price that includes deductions for transportation, treating, blending, and other fees. (Dkt. # 62 at 16.) YMC's sole piece of evidence for this assertion is a 2017 contract between RKI and SLP, which describes an "NGL Price"—the price SLP pays to WPX for the NGLs—as the price received by SLP, less a reduction for fees or charges for transportation, treating, blending, or other costs "actually incurred in making the sale." (Id. (citing Dkt. # 64-2 at Ex. D).) If SLP were indeed charging WPX for transportation, treating, blending, before the point of sale, and WPX did not add those charges back into YMC's royalty base, WPX would be making improper deductions. However, the contract cited by YMC in no way establishes this, and in fact, the summary judgment evidence contradicts such a suggestion. (See Dkts. ## 61-2 at 64:2-66:1, 122:14-125:6.) YMC has pointed the Court to no testimony or evidence suggesting that WPX was in fact deducting these types of fees from YMC's royalty. YMC has thus failed to raise a fact issue with respect to whether WPX has made improper deductions to YMC's royalty on NGLs.

categories. (Id. at 3.) In other words, if the Court agrees with WPX that it both (1) did not improperly deduct transportation and fractionation costs from the royalties owed on NGLs, and (2) overpaid YMC in royalties owed on oil, then YMC received more money than it was owed regardless of the amounts allegedly owed for flared gas and plant fuel. (Id. at 3, 19.) The Court will therefore refrain from addressing these two categories in the present motion. To the extent WPX seeks a determination from the Court that royalties are not owed on these two categories of gas, the Court **DENIES** the motion. See Fed. R. Civ. P. 56(c).

C. Overpayment of Royalties on Oil

Finally, WPX argues that, because it "overpaid" royalties due to YMC on oil, and such "overpayments" exceed the amount of alleged "underpayments," WPX did not breach the Lease as a matter of law. (Dkt. # 59 at 3, 10–14, 19.) WPX's argument misses the mark.

In Texas, a claim for breach of contract requires a showing that: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd., 574 S.W.3d 882, 890 (Tex. 2019). "A breach occurs when a party fails or refuses to do something he has promised to do." Mays v. Pierce, 203

S.W.3d 564, 575 (Tex. App. — Houston [14th Dist.] Sept. 26, 2006, pet. denied); see Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc., 518 S.W.3d 432, 436 (Tex. 2017).

The Lease requires WPX to pay YMC its share of royalties on oil and gas produced from the land. (Dkt. # 74-7 at Ex. B-1, Section 3.) Specifically, the Lease requires WPX to pay YMC: (1) "on oil, twenty-five percent (25%) of that produced from said land . . . ;" (2) "on gas . . . produced from said land, twenty-five percent (25%) of the amount realized from the sale thereof . . . ;" and (3) "on gas . . . produced from said land, and used off the premises, twenty-five percent (25%) of the market value of the gas at the location where the gas would first be marketable if sold." (Id.) In its motion, WPX does not contest that it has failed to pay royalties due to YMC with respect to plant fuel and flared gas. (See Dkt. # 59.) And, although WPX later disputes whether it owes royalties to YMC on flared gas, it is undisputed that WPX failed to pay royalties on gas produced from Section 9 and used off the premises as plant fuel. (See Dkts. ## 59; 75; 88 at 1–2); Dkts. ## 74-7 at Ex. B-1, Section 3; 62-1 at 27:24-29:2; 62-2 at 3–4; 62-16 at 125:5-25; 62-26 at 48:3-56:11.) WPX therefore breached the Lease. (Id.); see Randle, 620 S.W.3d at 399–400 ("Bluestone breached the lease by not paying any royalties on volumes of gas used off-premises by Crestwood as Plant Fuel"); Mays, 203 S.W.3d at 575.

WPX's argument, in essence, asks the Court to conclude that an alleged overpayment in one category of royalty negates a breach arising from WPX's admitted failure to pay a different category of royalty. Such an argument is not supported by the law, and the Court will not credit it. Mays, 203 S.W.3d at 575 ("A breach occurs when a party fails or refuses to do something he has promised to do."); ExxonMobil Glob. Servs. Co. v. Gensym Corp. & Versata Enters., 54 F. Supp. 3d 707, 711 (W.D. Tex. 2014) ("'Breach' is the failure, without legal excuse, to perform any promise that forms all or part of an agreement.").

WPX's argument is perhaps more appropriately framed as a challenge to the element of damages rather than the element of breach. See MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, L.L.C., 664 S.W.3d 102, 106 (Tex. 2023) (discussing the rules for measuring benefit of the bargain damages). However, in the instant motion, WPX moves for summary judgment *solely* on the ground that no breach occurred.[27] (See Dkt. # 59 at 1, 3, 14, 19.) Accordingly, the issue of damages is not before the Court on this motion, and the Court therefore does not

[27] Even if WPX's reply could be understood as challenging the damages element, WPX waived this argument by not raising it in the motion itself. (See Dkt. # 85 at 8); Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010).

address it.[28] WPX's motion is thus **DENIED** insofar as it seeks a determination from the Court that WPX did not breach the Lease as a matter of law because YMC was paid more in royalties than it was due under the Lease.

III. YMC's Motion for Summary Judgment on its Breach of Contract and Quiet Title Causes of Action (Dkt. # 62)

YMC seeks summary judgment on its breach of contract and quiet title causes of action, Counts 1 and 5 of its Second Amended Complaint. (Dkt. # 62.) With respect to its breach of contract claim, YMC asserts that WPX breached the Lease by: (1) by failing to pay royalties on volumes of gas flared at various well locations ("flared gas"); (2) by failing to pay royalties on volumes of gas used as fuel in a processing plant ("plant fuel"); (3) by underpaying royalties on natural gas liquids ("NGLs") (i.e., making improper deductions from the royalties due to YMC from the sale of NGLs); and (4) by failing to provide a recordable instrument of surrender of the Lease. (See Dkts. ## 34 at 7; 62 at 7–16.) These breaches, YMC argues, resulted in substantial damages to YMC, which YMC is entitled to recover. (Dkt. # 62 at 16.) Specifically, YMC is owed $1,023,258 from WPX's improper royalty deductions and an additional $32,000 a day for WPX's failure to provide a recordable instrument of surrender within thirty

[28] WPX does, however, raise a challenge to the element of damages in its response to YMC's summary judgment motion. (See Dkt. # 75 at 11.) The Court will therefore analyze WPX's overpayment argument in the context of YMC's motion.

days of YMC's March 8, 2024 demand (an amount totaling over $18 million dollars at the time of YMC's motion). (Id.) With respect to its quiet title suit, YMC argues that, based on YMC's December 3, 2021 "notice of nonpayment" of royalties and WPX's failure to cure its breach within thirty days of this notice, the Lease terminated. (Id. at 17–21.) Therefore, YMC owns 100% of the underlying fee oil and gas mineral interest in Section 9, YMC says. (Id. at 21.) YMC accordingly asks the Court for an order declaring the Lease terminated and requiring WPX to release the Lease of record, thereby quieting title under the Lease. (Id.)

A. Breach of Contract

A breach of contract claim requires a showing that: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." Pathfinder, 574 S.W.3d 882 at 890. Because the Court finds that fact issues exist with respect to whether YMC has sustained recoverable damages, the Court finds that summary judgment is not appropriate on YMC's breach of contract claim.

Under Texas law, in order to succeed on a breach of contract claim, the plaintiff must establish that he has suffered recoverable damages. See Shastry

v. U.S. Bank Nat'l Ass'n as Tr. to Wachovia Bank Nat'l Ass'n, No. 3:16-CV-3335-G-BN, 2021 WL 849015, at *11–12 (N.D. Tex. Feb. 11, 2021), report and recommendation adopted sub nom. Shastry v. U.S Bank Nat'l Ass'n as Tr. to Wachovia Bank Nat'l Ass'n, No. 3:16-CV-3335-G-BN, 2021 WL 842132 (N.D. Tex. Mar. 5, 2021) ("Because Plaintiffs have failed to allege any compensable damages, their breach of contract claim must fail."); Seghers v. Woodward, No. 3:06-CV-1393-L, 2008 WL 351237, *10 (N.D. Tex. Feb. 8, 2008) ("Damages are an essential element to [the plaintiff's] case and an element upon which he bears the burden of proof at trial. In order to survive summary judgment, [the plaintiff] must make a showing sufficient to establish the existence of his damages."); Bader v. Rocket Mortg., LLC, No. 4:25-CV-00006, 2025 WL 1476648, at *2 (S.D. Tex. Apr. 29, 2025), report and recommendation adopted, No. 4:25-CV-00006, 2025 WL 1476581 (S.D. Tex. May 22, 2025) ("[W]ithout recoverable damages, the breach-of-contract claim fails."); Brown v. DFS Servs., L.L.C., 434 F. App'x 347, 353, 353 n.3 (5th Cir. 2011) (holding that, "[t]o recover for breach of contract, the plaintiff must prove that he has suffered some monetary loss, and finding that because the plaintiff could not establish the "necessary element of compensable injury," the Court would not reach the remaining elements of the claim); Johnson v. Safeco Ins. Co. of Indiana, 240 F. Supp. 3d 555, 563 (N.D. Tex. 2017) ("At bottom, the fate of Plaintiffs' breach-of-contract claim turns on whether Plaintiffs

suffered a pecuniary loss."); see also Dulcich, Inc. v. DaPron, No. 3:23-CV-00405, 2025 WL 2147068, at *4 (S.D. Tex. July 29, 2025), report and recommendation adopted, No. 3:23-CV-405, 2025 WL 2337051 (S.D. Tex. Aug. 13, 2025) ("[M]oney damages are essential in contract claims in contract claims seeking money damages (though not for contract claims seeking something else)." (quoting Intercontinental Grp. P'ship v. KB Home Lone Star L.P., 295 S.W.3d 650, 655 n.26 (Tex. 2009))).

"[In Texas], '[t]he normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure.'" Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co., 173 F. Supp. 3d 363, 395 (N.D. Tex. 2016), aff'd as modified and remanded, 725 F. App'x 256 (5th Cir. 2018) (quoting Mays, 203 S.W.3d at 577. "This measure represents the difference between the value expected from the contract and the value actually received by the non-breaching party." Seghers v. Woodward, No. 3:06-CV-1393-L, 2008 WL 351237, *8 (N.D. Tex. Feb. 8, 2008); see MSW, 664 S.W.3d at 106 ("The general rule for measuring benefit of the bargain damages is to calculate the difference between what was promised and what was received."). The objective of such a measure "is to provide just compensation for the loss actually sustained by the complaining party." Virtuolotry, LLC v. Westwood Motorcars, LLC, No. 05-19-01055-CV, 2024 WL 4211328, at *6 (Tex. App. — Dallas Sept. 17, 2024, pet. denied); see Seghers,

2008 WL 351237, *8; MSW, 664 S.W.3d at 106.

Under this framework, a nonbreaching party "generally should be awarded neither less nor more than his actual damages." MSW, 664 S.W.3d at 106. Stated another way, a nonbreaching party is "preclude[d] . . . 'from recovering damages for breach of contract that would put [it] in a better position than if the contract had been performed.'" White Knight Dev., LLC v. Simmons, 718 S.W.3d 203, 209 (Tex. 2025) (quoting Sky View at Las Palmas, LLC v. Mendez, 555 S.W.3d 101, 113 (Tex. 2018)).

WPX argues that, because YMC was ultimately paid more in royalties than it was owed under the Lease, YMC has suffered no damages. (Dkt. # 75 at 11.) More specifically, WPX contends that, under the terms of the Lease, YMC was entitled to an oil royalty based on the value of the oil at the well, which means, under Texas law, WPX did not owe YMC royalties on oil free of post-production costs. (Id.) Because WPX paid YMC royalties without deducting these costs, YMC was overpaid. (Id.) And, because these overpayments "far exceed[]" the disputed underpayment claims, YMC suffered no monetary loss. (Id.) As such, YMC's breach of contract claim fails. (Id.) Upon its review of the relevant law, the parties' briefing, and the summary judgment record, the Court finds that there are issues of material fact as to whether YMC suffered recoverable damages, thereby precluding summary judgment on YMC's breach of contract claim. See

Brown, 434 F. App'x 347 at 353, 353 n.3.

With respect to oil royalties, the Lease provides:

> Royalties on leased substances to be paid by Lessee to Lessor are: (a) ***on oil, twenty-five percent (25%) of that produced from said land, to be delivered at the wells or, at Lessor's option, to the credit of Lessor into the pipeline to which the wells may be connected***; . . . ***Royalties to Lessor shall be computed and paid without deduction*** for any costs or expenses of development, production, treatment, separation, dehydration, gathering, compression, transportation, manufacturing, processing, fractionation, treating, marketing, ***or any other costs of whatsoever nature*** except Lessor's share of taxes on production.

(Dkt. # 74-7 at Ex. B-1 (emphasis added).)

WPX argues that, under these terms, YMC is entitled to a royalty based on the value of the oil at the well and that that this royalty interest therefore bears its share of post-production costs. (See Dkt. # 75 at 11.) As YMC points out, however, the Lease requires YMC's oil royalty to be paid "in-kind" rather than in monetary payments. (Dkt. # 63 at 6–11.) As a result, while the Court agrees with WPX that, if the Lease provided for the payment of oil royalties in cash *or* in-kind, YMC's royalty would necessarily bear its share of post-production costs under the terms of the parties' Lease, see Burlington Resources, 573 S.W.3d at 206–07, 211 ("Courts have often interpreted the phrase "at the well" or "at the wellhead" to establish a wellhead valuation point[.]"); Carl v. Hilcorp Energy Co., 689 S.W.3d 894, 897 (Tex. 2024) ("[I]t has long been the law that the holder of an 'at-the-well' royalty must share proportionately in the post-production costs

expended on the products of the well prior to sale."); Fasken, 733 S.W.3d at 29–30 ("To deviate from this general rule, a royalty agreement must ""plainly and in a formal way" express[ ] [the parties'] intent ... to "operate differently.""""); id. at 32 ("When a royalty provision calls for valuation at the well, a cost-free term does not free a royalty of postproduction costs because such costs are not incurred to produce the minerals. This is true even when the cost-free term refers to specific postproduction costs, like the clause in [Heritage], which expressly stated 'there shall be no deductions from the value of Lessor's royalty [for] processing, cost of dehydration, compression, transportation or other matter to market such gas.' Absent reference to another valuation point or calculation method in the deed, cost-free language merely restates the rule that a royalty interest is free of costs incurred in exploring for and producing the raw minerals."); Oliver, 2026 WL 545190, at *1, 6 (in the case of an "at the well" lease, where the lease provided that the royalty "shall never bear, either directly or indirectly . . . any other costs or expenses whatsoever," determining that such language is "mere surplusage"), the Lease does not so provide. Rather, as WPX concedes, it requires oil royalties to be paid "in-kind." (Dkt. # 59 at 11); see Myers-Woodward, LLC v. Underground Servs. Markham, LLC, 716 S.W.3d 461, 473 (Tex. 2025) ("Deed language contemplating delivery of the production to the royalty holder creates an in-kind royalty."). WPX's argument on this point is therefore not entirely persuasive. Nevertheless,

the Court finds that there are fact issues with respect to whether YMC was in fact paid more in royalties than it was due under the terms of the parties' Lease.

An "in-kind" royalty clause entitles the royalty owner to a share of the production itself rather than a share of the production's cash value. Keeling, supra, at 711; Fasken, 733 S.W.3d at 33 n.44. However, "[a]s a practical matter, most royalty owners lack the resources to receive delivery of oil in kind." Byron C. Keeling, In the New Era of Oil and Gas Royalty Accounting: Drafting A Royalty Clause That Actually Says What the Parties Intend It to Mean ("In the New Era"), 69 BAYLOR L. REV. 516, 520 n.17 (2017). "The custom in the oil industry when a royalty owner fails to separately market his or her proportionate part of oil is that the lessee contracts with the crude purchaser for the royalty owner's benefit." Cook v. Tompkins, 713 S.W.2d 417, 419 (Tex. App. — Eastland July 17, 1986, no writ). But the lessee can also discharge its obligations under the lease in other ways. As one law review article explains:

> If, for whatever reason, a royalty owner does not or cannot take physical possession of its royalty share of the production under an in-kind royalty clause, then the lessee or producer may discharge its royalty obligation to the royalty owner in one of several ways:
>
> (1) The producer may deliver the royalty owner's share of the production to a pipeline purchaser or other third-party purchaser near the wellhead--free of cost, and to the royalty owner's credit--under the terms of a division order or other contract in which the purchaser pays the royalty owner directly for its share of the production.

> (2) The producer may buy the royalty owner's share of the production from the royalty owner on terms that the producer negotiates with the royalty owner.
>
> (3) Or, if the producer does not either buy the royalty owner's share of the production or deliver the royalty owner's share of the production to a purchaser free of cost, then under the implied marketing covenant, the producer must market and sell the royalty owner's share of the production--on the royalty owner's behalf--along with the producer's own share of the production.

Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 711–12; see also Byron C. Keeling & Karolyn King Gillespie, The First Marketable Product Doctrine: Just What Is the "Product"?, 37 ST. MARY'S L.J. 1, 18 (2005).

The limited authority addressing this issue further indicates that, "[i]n the absence of an express provision in an oil and gas lease with respect to marketing the production," if the lessor "fail[s] either to provide storage or to arrange for the marketing of his share of the royalty oil," the lessee is not only impliedly authorized to sell the oil on the lessor's behalf but is obligated to do so. Wolfe v. Prairie Oil & Gas Co., 83 F.2d 434, 437 (10th Cir. 1936); see Cook, 713 S.W.2d at 420 (finding, where the lessor failed to separately market or store her proportionate part of royalty oil, the lessee had implied authorization to market the lessor's oil on her behalf, and that the lessee met its implied duty to market by doing so); Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 712 n.38 ("If the lessor does not opt to take the royalty in[-]kind, either expressly or by implication, then the lessee has not only the right but the obligation to market the oil [on] the lessor's behalf." (quoting Phillip Wm. Lear, First Purchaser

Suspense Accounts, 33 ROCKY MTN. MIN. L. INST. § 17.02[2] (1988)); Keeling & Gillespie, supra, at 18 n.68 ("If a lessor has made no arrangements to take or store royalty oil, the lessee has the implied authority to sell the lessor's royalty oil along with the lessee's share of production."); see also David E. Pierce, Incorporating A Century of Oil and Gas Jurisprudence into the "Modern" Oil and Gas Lease, 33 WASHBURN L.J. 786, 818–19 (1994) ("[M]ost lease forms are silent concerning the lessee's authority to sell the lessor's share … The limited authority addressing the issue indicates the lessee has an implied right to sell the lessor's oil when the lessor fails to arrange to take it in kind."). In such circumstances, the lessor is generally entitled to only its share of the net proceeds from the sale (that is, the lessee is entitled to deduct from the gross proceeds the lessor's share of post-production costs). See Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 712 ("If … the producer sells the royalty owner's share of the oil and gas production, the producer must pay the royalty owner the net proceeds that the producer received for the royalty owner's share of the production--or, in other words, the producer must pay the royalty owner its share of the actual sales price for the oil and gas production, minus the royalty owner's share of the costs that the producer incurred to make the production marketable and deliver it to the downstream point of sale."); Keeling, In the New Era, supra, at 520 n.17 ("If a lessor makes no arrangements to receive a royalty share of the lessee's production,

then typically—but subject to the terms of the royalty clause—the lessee may market the lessor's share of the production along with the lessee's share and pay to the lessor the amount that the lessee receives for the lessor's share of the production, minus the lessor's share of any applicable post-production costs."); see also Nettye Engler, 639 S.W.3d at 686, 696 (where lease provided for in-kind royalty, and where wellsite operator sold royalty owner's share along with lessee's share, holding that lessee discharged its royalty obligation by paying royalty owner its "fractional share on a net-proceeds basis that deducts from gross sales proceeds the postproduction costs incurred"); Carl, 689 S.W.3d 894, 897 (Tex. 2024) ("[I]t has long been the law that the holder of an 'at-the-well' royalty must share proportionately in the post-production costs expended on the products of the well prior to sale.").

In this case, from the evidence submitted to the Court, it is not clear whether or not YMC has made arrangements to take or store its share of the oil produced on Section 9. It is also not clear whether or not the parties have entered into another arrangement by which WPX may properly discharge its royalty obligation to YMC.[29] If YMC has not made arrangements to take or store royalty

[29] Although evidence submitted to the Court suggests that the parties may have had an arrangement permitting WPX to sell YMC's share of oil on behalf of YMC and then pay YMC a percentage of the proceeds from the sale, (see Dkts. ## 74-7 at 4–5, ¶ 12 (Rehman Declaration); 60-5 at ¶ 13; 75 at 4; 63 at 7; see also Dkt. # 62-25

oil, and if the parties have not come to another arrangement permitted under the Lease and the law, then WPX would be authorized to sell YMC's share of oil on YMC's behalf. See Wolfe, 83 F.2d at 437; Cook, 713 S.W.2d at 420. And, in that scenario, WPX would, as it contends, be authorized to deduct post-production costs from that amount. See Keeling, Fundamentals of Oil and Gas Royalty Calculation, supra, at 712; Keeling, In the New Era, supra, at 520 n.17; see also Nettye Engler, 639 S.W.3d at 686, 696; Carl, 689 S.W.3d at 897. However, the summary judgment record does not establish these facts one way or the other. As such, the Court finds there to be fact issues precluding summary judgment. Stated differently, because the record reveals a genuine issue of material fact as to whether WPX was authorized to sell YMC's share of oil on YMC's behalf and deduct post-production costs, there is also a genuine issue of material fact as to whether YMC was overpaid in royalties, and a genuine issue of material fact as to whether YMC has sustained recoverable damages.[30] YMC has therefore not

(Division Order)), it is not at all evident that an agreement was in fact made or that such an agreement complied with the terms of the Lease and Texas law.

[30] By way of illustration, the summary judgment evidence suggests that, for a period of over five years, WPX paid YMC a monthly royalty on oil that was *free* of post-production costs. (Dkts. ## 60-5 at ¶ 13; 60-4 at ¶ 7; see Dkts. ## 61-2 at 78:17-79:7; 74-7 at 4–5, ¶ 12 (Rehman Declaration); id. at Ex. B-14.) WPX's expert witness attests that the total amount of post-production costs incurred but not deducted during this time period was $2,190,812.61. (Dkt. # 60-4 at ¶ 7.) This amount, the expert witness testifies, exceeds the amount YMC claims it was underpaid royalties with respect to plant fuel and flared gas by $1,618,697.29. (Id. at ¶ 15.) YMC does not appear to contest these calculations (although it does

established its entitlement to summary judgment on its breach of contract claim, and its motion with respect to this claim must be denied.[31]

YMC's arguments to the contrary are unpersuasive. First, YMC contends that, because WPX "knowingly and intentionally agreed to pay and actually paid royalty on oil based on gross proceeds for years,"[32] WPX either waived its overpayment argument or should be estopped from asserting such an

---

dispute whether WPX is in fact entitled to deduct post-production costs). Accordingly, if YMC was in fact not entitled to a royalty free of post-production costs, and WPX's calculations are correct, YMC would have been paid more royalties than it was due under the terms of the Lease, and would have, in turn, not suffered recoverable damages. See White Knight, 718 S.W.3d at 209; Shastry, 2021 WL 849015, at *11–12.

[31] YMC alleges that WPX breached the contract in four ways: (1) by failing to pay royalties on flared gas; (2) by failing to pay royalties on plant fuel; (3) by underpaying royalties on NGLs; and (4) by failing to provide a recordable instrument of surrender of the Lease. (See Dkts. ## 34 at 7; 62 at 7–16.) Because, as discussed in previous sections, the Court finds that the Lease did not terminate and that WPX did not underpay YMC on royalties owed on NGLs, the only relevant breaches for purposes of a damages calculation are the alleged breaches related to flared gas and plant fuel. According to YMC, those breaches resulted in damages amounting to $227,126 and $21,653.00 respectively. (Dkts. ## 62 at 8, 11; 62-27 at ¶¶ 6, 7 (Leathers Declaration); see Dkt. # 60-4 at ¶¶ 11, 12 (describing the amount of royalties owed on plant fuel through November 2024 to be $180,532 and on flared gas through the same period to be $259,295.)

[32] Specifically, in its briefings, YMC asserts that, although the Lease required the oil royalties to be paid in-kind, "YMC has always agreed to accept—in lieu of an in-kind delivery of oil—payment of 25% of the gross proceeds from the sale of oil to the first purchaser not affiliated with or related to the Lessee (without deduction for any post-production costs or expenses, or any other costs of whatsoever nature except Lessor's share of taxes on production)." (Dkt. # 63 at 7 (incorporated by reference into YMC's reply to the instant summary judgment motion).) And, according to YMC, "each Lessee under the Lease has always agreed to pay YMC 25% of gross proceeds." (Id.)

argument. (Dkt. # 63 at 7–10.)

"Under Texas law, the elements of [waiver] include: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence, and; (3) actual intent to relinquish the right, which we can infer from conduct." Yturria v. Kerr-McGee Oil & Gas Onshore, LLC, 291 F. App'x 626, 636 (5th Cir. 2008) (citing ASI Techs., Inc. v. Johnson Equip. Co., 75 S.W.3d 545, 548 (Tex. App. — San Antonio Mar. 6, 2002, pet. denied). The doctrine of quasi-estoppel, on the other hand, "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken." Bott v. J.F. Shea Co., 299 F.3d 508, 512 (5th Cir. 2002). "The doctrine [of quasi-estoppel] applies in instances where it 'would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.'" Shoop v. Devon Energy Prod. Co., L.P., No. 3:10-CV-00650-P, 2013 WL 12251353, at *24 (N.D. Tex. Mar. 28, 2013) (quoting Bott, 299 F.3d at 512). Both waiver and quasi-estoppel are affirmative defenses that place the burden of proof on the party asserting the defense. See In re S.A.P., 156 S.W.3d 574, 576 (Tex. 2005) (estoppel); Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C., 470 S.W.3d 636, 646 (Tex. App. — Dallas 2015, no pet.) (waiver). With respect to both waiver and estoppel, the Court concludes that YMC has not met its Rule 56(c) burden. Specifically, as to waiver, the Court finds that

YMC has failed to establish that WPX knew of its right to deduct post-production costs from YMC's oil royalties or that it intended to relinquish that right.[33] And, as to estoppel, the Court finds that YMC has failed to present any evidence to indicate that it would be unconscionable for WPX to pursue its overpayment argument.[34] The Court therefore rejects these arguments insofar as YMC seeks summary judgment that waiver and estoppel apply.

Second, YMC argues that WPX's overpayment argument is in reality a counterclaim, and as such, is barred by the statute of limitations. (Dkt. # 63 at 14–16.) But, in this case, where WPX does not seek repayment of money from YMC, and where WPX's overpayment argument is defensive in nature, the statute of limitations does not apply. See Gulf Oil Corp. v. Lone Star Producing Co., 322 F.2d 28, 33 (5th Cir. 1963) ("When we consider the unitary nature of the contract, it becomes clear that [the plaintiff's] action was really for the balance due under that contract, the overpayments were defensive in nature, and the statute of limitations simply does not apply."); Tamimi Glob. Co., Ltd v. Kellogg Brown &

[33] YMC cites evidence related to WPX's awareness of its method of calculating royalties and its awareness of the Lease's language. (Dkt. # 63 at 8.) Such evidence, however, in no way establishes actual or constructive knowledge of a right to deduct post-production costs nor intentional relinquishment of such a right.

[34] Importantly, WPX is not seeking to affirmatively recover any alleged overpayments but only to credit those overpayments against any alleged underpayments. YMC has not sufficiently shown why doing so would unjustly prejudice YMC or would be unconscionable. See Shoop, 2013 WL 12251353, at *24.

Root, L.L.C., 483 S.W.3d 678, 702 (Tex. App. — Houston [1st Dist.] Dec. 15, 2015, no pet.). ("If the subject-matter of the contention is intrinsically defensive in nature and would, if given effect, operate merely to negate the plaintiffs asserted right to recover, the statute of limitations does not apply." (internal citations omitted)).

Third, YMC argues that WPX's overpayment claim is barred by the voluntary payment doctrine. (Dkt. # 63 at 16–17.) But again, because WPX's overpayment argument is defensive in nature and because WPX is not seeking compensation for any "overpaid" amount, the voluntary payment doctrine also does not apply. See Shoop, 2013 WL 12251353, at *21–22 (finding the voluntary payment rule does not apply where the defendant was not seeking compensation, not alleging unjust enrichment, and only seeks to prevent double recovery on the plaintiff's claims).

Because the Court finds that fact issues remain as to whether YMC in fact suffered recoverable damages, the Court **DENIES** YMC's motion for summary judgment as to its breach of contract claim. (Dkt. # 62.)

B. Quiet Title

YMC also seeks summary judgment on its quiet title cause of action. (Dkt. # 62 at 17–20.) YMC argues that, because the Lease terminated due to WPX's failure to cure its breach of the Lease within 30 days of receiving YMC's

notice of nonpayment, it owns 100% of the underlying fee oil and gas mineral interest in Section 9. (Id. at 20.) Because the Court has found that the Lease did not terminate pursuant to YMC's December 3, 2021 notice, YMC's request for summary judgment on this claim is **DENIED**.

## IV. WPX's Motion to Strike (Dkt. # 78)

WPX objects and moves to strike certain evidence attached to YMC's summary judgment motions. (Dkt. # 78.) Specifically, WPX moves to strike: (1) correspondence from YMC (Dkts. ## 62-12; 62-14; 63-9; 62-15; 63-10; 62-17; 62-20; 62-23; 63-13; and 63-16); (2) the deposition of Ciara Davis (Dkts. ## 62-16; 63-11); (3) a November 9, 2022 email (Dkt. # 62-20); (4) the affidavit of Ijaz Rehman (Dkts. ## 62-24; 63-14); (5) the affidavit of David M. Leathers (Dkt. # 62-27); and (7) a November 3, 2022 letter (Dkt. # 63-13).

In considering the summary judgment motions, the Court did not rely on these exhibits, with the exception of a portion of the deposition of Ciara Davis (Dkt. # 62-16), and the affidavit of David M. Leathers (Dkt. # 62-27). The Court will address WPX's objections to these two exhibits and will **DENY AS MOOT** WPX's motion to strike the remaining exhibits.[35]

[35] The Court notes that it did cite to the affidavit of Ijaz Rehman and certain objected-to correspondence from YMC in its order. Because the Court cited to this evidence in the context of WPX's summary judgment motion and YMC's responses, the Court addresses these exhibits in connection with WPX's next motion to strike. (Dkt. # 87.)

A. Deposition of Ciara Davis

WPX objects to "YMC's use of the deposition of Ciara Davis to the extent YMC seeks to use her testimony as that of WPX." (Dkt. # 78 at 3.) WPX argues that, because Ms. Davis was testifying in her personal capacity rather than as a corporate representative of WPX, her testimony is not binding on WPX. (Id. at 3–4.) This objection is without merit. The only portion of the deposition upon which the Court relied involved Ms. Davis testifying as to facts within her personal knowledge based on her role and actions as WPX's lead accountant. (See Dkt. # 62-16 at 125:5-25.) Such testimony is properly considered in ruling on the summary judgment motions at bar. See Fed. R. Ev. 602. WPX's motion to strike this exhibit is **DENIED**.

B. Affidavit of David M. Leathers

WPX next objects to paragraphs 5, 6, and 7 Affidavit of David M. Leathers as containing improper legal conclusions, constituting inadmissible parol evidence, and impermissibly departing from Mr. Leather's prior testimony. (Dkt. # 78 at 6–8.) The Court did not cite to nor rely on paragraph 5 of Mr. Leather's affidavit. And, with respect to paragraphs 6 and 7, the Court relied on these paragraphs insomuch as they provided YMC's estimate of its damages related to plant fuel and flared gas. It did not accept as true any legal conclusions included in those paragraphs. WPX's motion to strike the affidavit of David M. Leathers on

these bases is **DENIED**.

V. WPX's Motion to Strike (Dkt. # 87)

WPX also objects and moves to strike certain evidence attached to YMC's responses to WPX's summary judgment motions. (Dkt. # 87.) Specifically, WPX moves to strike: (1) the deposition of Ciara Davis (Dkt. # 74-3 at Ex. 9); (2) a November 3, 2022 letter (Dkt. # 74-4 at Ex. 15); (3) the affidavit of Ijaz Rehman (Dkt. # 74-7 at 2–11); (4) correspondence from YMC (Dkt. # 74-7 at Exs. B-4, B-6, B-7, B-8, B-10, B-12, B-13); and (5) the affidavit of David M. Leathers (Dkt. # 74-8).

In considering the summary judgment motions, the Court did not rely on these exhibits, with the exception of the deposition of Ijaz Rehman (Dkt. # 74-7 at 2–11), and three items of correspondence from YMC (Dkt. # 74-7 at Exs. B-4, B-6, and B-7). The Court will address WPX's objections to these two exhibits and will **DENY AS MOOT** WPX's motion to strike the remaining exhibits.

A. Affidavit of Ijaz Rehman

WPX objects to the affidavit of Ijaz Rehman as containing irrelevant statements, improper legal conclusions, and inadmissible parol or extrinsic evidence concerning an unambiguous written agreement. (Dkt. # 87 at 4–5.) WPX also raises an objection under the best evidence rule. (Id. at 5.) The one paragraph cited by the Court in its order from this affidavit, paragraph 12, is

plainly relevant, contains no legal conclusions, and is not seeking to prove the contents of a writing, recording, or photograph. (See Dkt. # 74-7 at 4–5, ¶ 12); Fed. R. Ev. 401; Fed. R. Ev. 1002. To the extent this paragraph contains evidence extrinsic to the parties' Lease, the Court did not rely on it to "add, alter, or change the contract's agreed-to terms." See Nette Engler, 639 S.W.3d at 690. WPX's motion to strike this evidence is **DENIED**.

B. Correspondence from YMC

WPX also objects to certain letters sent by YMC to WPX on the basis of relevance, hearsay, and lack of authentication. (Dkt. # 87 at 5–6.) However, these letters are highly relevant, are not offered to prove the truth of the matter asserted, and are properly authenticated. See Fed. R. Ev. 401; Fed. R. Ev. 801; Fed. R. Ev. 803(6); Lee, 859 F.3d at 355. WPX's motion to strike these letters is therefore **DENIED**.

VI. YMC's Motion to Strike (Dkt. # 91)

YMC objects and moves to strike certain evidence attached to WPX's responses to YMC's summary judgment motions. (Dkt. # 91.) Specifically, YMC moves to strike: (1) portions of the declaration of Ciara Davis (Dkt. # 77-2); (2) the declaration of Tim Smith (Dkt. # 77-3); (3) various photographs attached to the declaration of Tim Smith (id.); (4) the declaration of Taylor Noland (Dkt. # 77-4); (5) certain exhibits attached to the declaration of Taylor Noland (id.); and (6) the

declaration of Angela Paslay (Dkt. # 77-5). However, in considering the summary judgment motions, the Court did not rely on these exhibits. Accordingly, YMC's motion to strike these exhibits is **DENIED AS MOOT**.

CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART AND DENIES IN PART** Defendant's Motion for Partial Summary Judgment (Dkt. # 58), **GRANT IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment of No Breach Lease (Dkt. # 59), **DENY** Plaintiff's Motion for Summary Judgment on its Breach of Contract and Quiet Title Causes of Action (Dkt. # 62); and **DENY** the omnibus objections to and motions to strike the various summary judgment evidence (Dkts. ## 78; 87; 91).

Counts 2 and 5 of Plaintiff's Second Amended Complaint are hereby **DISMISSED**. Count 1 of Plaintiff's Second Amended Complaint is **DISMISSED IN PART** to the extent the claim is based on a finding that the Lease terminated. Counts 1, 3, 4 and 6 remain. Trial in this case will be set by separate order.

**IT IS SO ORDERED**.

**DATED**: Austin, Texas, July 28, 2026.

David Alan Ezra
Senior United States District Judge